UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCO J. SERRANO,<br><br>        Petitioner,<br><br>    v.<br><br>JEFF MACOMBER,<br><br>        Respondent. | Case No. 14-cv-03106-JD<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |

Francisco Serrano, a pro se state prisoner, has brought a habeas petition pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it. Serrano filed a traverse. The petition is denied.

**BACKGROUND**

A jury found Serrano guilty of aggravated assault and active participation in a criminal street gang and that he personally inflicted great bodily injury. Clerk's Transcript ("CT") at 666-70. The jury deadlocked on the count of attempted premeditated murder. CT at 666. Serrano was sentenced to 14 years and eight months in prison. CT at 833, 840. The California Court of Appeal affirmed the judgment, but stayed the eight-month sentence imposed for active participation in a criminal street gang. *People v. Serrano*, No. A134211, 2013 WL 441960, at *1 (Cal. Ct. App. Feb. 6, 2013). The California Supreme Court denied a petition for review. Answer, Ex. C.

# STATEMENT OF THE FACTS

The California Court of Appeal summarized the relevant facts of the underlying crime as follows:

> **Testimony of Detective John Cregan**
> John Cregan of the Santa Rosa Police Department testified that he was a detective assigned to the department's gang crimes team. On July 21, 2010 at 7:54 p.m., he responded to a radio dispatch that a stabbing had occurred on Washington Street in Santa Rosa. He drove to the reported scene of the incident and saw a "young man" with "visible injuries." The young man, identified as Jose Cortez by Cregan at trial, had "numerous bleeding wounds on his back and chest area." Cortez was accompanied by his "girlfriend, Cindy Chavarria," who was "wearing a bright red, zip up sweater." At trial he identified a photograph he took of "Chavarria" at the police department showing the "red little zip up sweater, or sweatshirt, that she was wearing the night of this incident," as well as photographs of the sweater itself.
>
> Cregan viewed the private home surveillance video of a resident in the vicinity that depicted the incident, and, based on the video, he broadcast "what suspect descriptions [he] could see" and a vehicle description to patrol officers. He obtained a copy of the video and booked it into evidence.
>
> **Testimony of Area Residents**
> Brittany Baer testified that she was in the living room of her Washington Street home, which was "100 feet, maybe" from the street, when she heard "a bunch of feet stomping." She looked outside and "noticed a boy. It looked like he tripped and fell. Two people ran past him, and another boy came and stood over top of him." This boy, who was a "light skinned, Hispanic male," stood over the victim and made "arm movements" over the top of the victim that were "[n]ot your typical punches; it was more side motion, into the victim's side." Baer saw a "small object sticking out of the attacker's hand" that "looked like a small blade," and she thought he was stabbing the victim. The attacker "looked very young;" he seemed younger than Baer, who was 25 years old.
>
> According to Baer, the attacker stabbed the victim at least 15 times. Two other men stood watching. The attacker ran when a neighbor came outside and yelled at him. The victim yelled for an ambulance and asked people to call 911.
>
> Jason Taylor testified that he also lived on Washington Street. On the evening in question, he was watching television when he heard someone run by his window. When he heard some commotion, he and his wife opened their front door and took a look outside. They saw "a car out on the street." Three men were kicking and punching a man on the ground. He noticed one attacker leaning over the victim and "kind of punching on him." After his wife yelled at the attackers to "[g]et off him," the attackers jumped into a "little sedan type car" that sped off. The victim came stumbling towards his

2

house and asked them to call 911 and for an ambulance.

Kira Lee, Taylor's wife, testified that she was in her living room watching television on the night of the incident when she noticed a car stopped in the middle of the street. She went outside and saw "four guys" "beating up" someone. She yelled that they should stop and when they did not, she called the police. She saw a car in the middle of the street, and the attackers get in it and take off. She did not realize someone was being stabbed or "how bad it was until the victim stood up and he said, 'I need help. I need an ambulance.' And then, all of a sudden, he just started bleeding everywhere."

**Testimony of Cindy Sarabia Antonia and Jose Rafael Cortez**
Cindy Sarabia Antonia, also identified in the reporter's transcript as "Cindy Sarabia–Chavarria" (Sarabia), testified that she was 19 years old, and that Jose Rafael Cortez (Cortez) was her boyfriend at the time he was stabbed. On the evening in question, Cortez was walking with her on Ninth Street as they headed to her home. Sarabia was wearing a burgundy-colored sweater. As they walked past a church, a gold car with four doors, with four or five people inside, gave Cortez "attention." One of them, a man, asked Cortez if he was Norteño, and "what hood he was from." According to Sarabia, Cortez was not a Norteño, but he did "hang out" with Norteños.

At some point, the car turned around, Cortez pushed her away and told her to run, he ran towards the other side of the church, and three "guys," all male, from the car "chased him around the corner, all the way down." As they chased him, they asked him "what hood are you from?" She thought it was some kind of gang challenge directed at Cortez.

Sarabia, without a cell phone, looked everywhere to get help because she knew something was going to happen. As soon as the car left, she started walking quickly to Cortez. When she caught up to him, he was on the ground, alone. He said "they had stabbed him" and she saw that he was bleeding. Cortez underwent surgery and was hospitalized for two days. She assumed his attackers were Sureños because she was wearing a burgundy-colored sweater. She did not see their faces.

Cortez testified that he was 17 years old at the time of trial, and indicated that he did not want to appear in court. He acknowledged that he had been hospitalized in July 2010 for stab wounds, that the day he was stabbed he was walking his girlfriend, Sarabia, home, that he ran because he wanted to and was stabbed when he stopped running, and said that he did not know who stabbed him. He did not "hang out" with Sureños or Norteños, and had heard of the "Varrio Santa Rosa Norte" (VSRN) and thought it would be okay to "hang out" with someone who said they were VSRN.

Physician Chris Kosakowski, a surgeon, testified that according to his records, he treated Cortez on July 21, 2010. His dictation of the treatment provided indicated that he treated 17 stab wounds on Cortez's neck, chest, and arms.

3

**Testimony Regarding Evidence Obtained by Police**
Technician Janice Wohlert, an evidence technician with the Santa Rosa Police Department, testified that she processed a vehicle on July 22, 2010, which was the day after the incident. She was able to develop latent fingerprint samples from various parts of the outside of the car, including from the car rear window. She looked for, but did not find, any blood evidence in the vehicle. It was not disputed at trial that the vehicle belonged to Lorenzo Medina Avalos (Avalos), whose testimony we summarize below.

Forensic specialist John Jaynes testified as a latent print expert. He processed a latent print taken from the rear car window of the vehicle processed by Wohlert, entered the print into an automated fingerprint search computer, and received information linking the print to fingerprint samples taken from defendant on July 22, 2007. Jaynes conducted a manual comparison and determined that the print matched defendant's right palm print. He "rolled" another set of defendant's palm prints the morning that he testified, compared the latent print to that sample, and after a manual comparison determined that they were from the same person.

**Testimony of Lorenzo Medina Avalos**
Avalos testified pursuant to an agreement with the prosecution. He said he was 29 years old and had joined the Sureño gang when he was around 13 years old. He had Sureño gang-related tattoos, including the gang sign "13" on his elbow. His record included a youth authority commitment, convictions for misdemeanor domestic violence and receiving stolen property, and parole violations for associating with gang members. He had been arrested for the current incident and pled guilty to felony assault with a gang enhancement. He had agreed to a maximum four-year state prison sentence if he testified truthfully in this case. He testified that no other promises had been made to him concerning his testimony.

Avalos testified that he no longer considered himself a member of the Sureño gang. He said that he did not expect the Sureño gang to ever accept him for testifying in court, as his testimony was a violation of the gang code of conduct.

Avalos further testified that he "claimed" the Puro Sureño Cholo (PSC) set of the Sureño gang, which rival was the Norteño gang. The area around West Ninth Street in Santa Rosa was within PSC territory. PSC gang members gathered at Jacobs Park, drinking and using drugs. Norteños were not welcome near that park.

Avalos said that young teens were considered "pee wees" and were allowed to associate with gang members, and that those considered worthy were "jumped" into the gang. Defendant was a PSC gang member. Avalos also identified photographs of PSC gang members named Miguel and Jesus. At the time of the incident, Avalos said, defendant was 17 years old, and Miguel and Jesus were each 21.

On July 21, 2010, Avalos testified he went to Jacobs Park, where he heard that gang members had been jumping prospective members into the gang. He saw defendant, Miguel, and Jesus drinking beer, smoking marijuana, and ingesting cocaine, and joined them. A

4

young boy reported that there were Norteños down the street; there was some talk about confronting them, and some went off to confront them. About 10 or 15 minutes later, he saw police cars speed by and he, defendant, Miguel, and Jesus drove away in his car, a Honda, at Avalos's suggestion.

Avalos further testified that, as he drove down West Ninth Street, near Saint Rose Church, he saw "an individual walking with his girlfriend" walking down the street and noticed that the female was wearing a "red flannel sweater," and thought the male was dressed like a northerner. In the car, defendant said that he recognized the male because defendant had been previously "jumped" by him on a bus. Avalos joined the others in making hand gestures, and some may have flashed gang signs, at the couple. Avalos did a u-turn with his car to head back towards the couple and defendant jumped out of the car and chased the male down the street. Miguel and Jesus jumped out to join defendant as Avalos drove after him.

Avalos said he saw defendant attacking the victim, who was on the ground. Avalos parked his car and joined in, kicking and punching the victim. Miguel and Jesus arrived and attacked the victim as well. Avalos struck the victim with his fist and noticed that his hands were "real slippery." He saw blood on his hands and realized that the victim was getting stabbed. He did not have a weapon and did not see the others with weapons. When he saw the blood, he said, "let's go," and they all jumped in the car and left.

As they fled, Avalos asked defendant if he had "stuck" the victim, and defendant said, "Yeah, I stuck him." Defendant had blood on his shirt and his hand was bleeding. Defendant was handling a folding knife with a dark-colored handle. Defendant buried the knife, left his bloody shirt on a roof, and got rid of the victim's phone, which he had taken during the assault.

The next day, Avalos testified, he received a call from a detective, who told him that the police had a video of the incident. Avalos told defendant. Avalos went to the police station, where he looked at the video and identified everyone, including defendant. He did so because he thought what had happened "wasn't right," as he expected a beating, but not a stabbing, was going to occur, and he had learned that the victim was his wife's cousin. He admitted that he lied to police at first about where the four went after the attack, but said that he otherwise told them the truth.

Avalos also testified that after he made a court appearance in the case, defendant walked past him, said, "You fucking snitch," and attacked him.

Avalos reviewed the home surveillance video, which consisted of two different views, at trial and testified that it showed him, his car, and the other participants in the attack, including depicting defendant stabbing the victim.

This court has reviewed the video as well. In the view that shows the most of the incident, an individual who appears to be male can be seen in the distance running down a sidewalk of a residential

5

> neighborhood and turning into the street, where he falls, as he is chased by another person. That person, who also appears to be male, catches up to him and attacks him repeatedly with both hands around his head and body. Cries can be heard. As this is taking place, a car comes into the frame and another person, apparently male, gets out and begins kicking and hitting the victim. Two other individuals, also apparently male, run over to the victim and attack him as well. Moments later, there are shouts. The four attackers appear to get into the car, a light-colored sedan, and drive away. People come out of houses and the victim gets up and walks toward a house, apparently seeking help; the victim appears to twice shout in a particular direction, "He stuck me." A few moments later, a female in a red top of some kind approaches him from that direction. No one's face can be seen distinctly in the video.
>
> **Testimony Regarding Defendant's Arrest**
> Manuel Acevedo, with United States Customs Border Protection, testified that on July 28, 2010, he was informed by Mexican authorities that they were turning over an individual to United States authorities at the port of entry. Acevedo, who learned this individual was defendant, took custody of him and booked him into the San Diego County Jail based on a pending felony warrant.
>
> . . .

*Serrano*, 2013 WL 441960, at *1-5.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority if it correctly identifies the governing legal principle from

1 the Supreme Court's decisions but "unreasonably applies that principle to the facts of the
2 prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply
3 because that court concludes in its independent judgment that the relevant state-court decision
4 applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the
5 application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under Section 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). In conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE

Serrano's sole ground for federal habeas relief is that there was insufficient evidence to support aggravated assault. He argues that there was insufficient independent proof or corroboration of the incriminating testimony from Lorenzo Medina Avalos, who was his accomplice in the assault but testified against him.

**Background**

California Penal Code section 1111 provides:

> A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.
>
> An accomplice is hereby defined as one who is liable to prosecution

7

> for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.

The jury was instructed that Avalos was an accomplice under state law. CT at 641; Reporter's Transcript ("RT") at 1017. The prosecutor argued in closing argument that:

> "[C]ommon sense dictate[ed]" that [the jury] should view Avalos's testimony "with caution" because of his criminal and gang background and the agreement he had entered into with the prosecution to limit his potential exposure in return for his testimony.
>
> The prosecutor then argued that there was "substantial corroboration" of Avalos's testimony. This included the home surveillance video that showed four individuals pursuing a man, including one individual who appeared to be consistent in appearance to the description of a young, light-skinned Hispanic male identified by Baer in her testimony, and a vehicle that was consistent in color and appearance with Avalos's car, on the outside rear window of which a partial palm print of defendant was found. Also, another individual appearing in the video was consistent in appearance to Avalos and could be seen hitting the victim's head. The video depicted an incident that was consistent with that described by Taylor, Lee, and Sarabia. Also, Sarabia's account of the gang references made during the incident was consistent with Avalos's account. There was also evidence that defendant had fled after the incident to Mexico. Finally, there was expert testimony regarding the gang motivation involved in defendant's actions.

*Serrano*, 2013 WL 441960, at *6.

**Legal Standard**

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id*. at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062, 2064 (2012) (per curiam) (finding that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the

8

evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). If no rational trier of fact could have found proof of guilt beyond a reasonable doubt, only then has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

**Discussion**

The California Court of Appeal discussed applicable state law and denied this claim:

> "To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.] Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime. [Citations.] '"[T]he corroborative evidence may be slight and entitled to little consideration when standing alone." [Citation.]' (*People v. Avila* (2006) 38 Cal. 4th 491, 562–563.) "'"Corroborating evidence 'must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged."'" "'"Corroborating evidence is sufficient if it substantiates enough of the accomplice's testimony to establish his credibility."'" (*People v. Rodrigues* (1994) 8 Cal. 4th 1060, 1128.) "'"The requisite corroboration may be established entirely by circumstantial evidence."'" (*ibid*), including "'evidence of the defendant's conduct or his declarations.'" (*People v. Douglas* (1990) 50 Cal. 3d 468, 507.)
>
> Accordingly, we are called upon to review the evidence independent of Avalos's testimony to determine whether it meets the standard required by section 1111. In doing so, we apply the general rules that apply to a challenge to the sufficiency of evidence. That is, we "'"must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citations.] 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We "'"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" [Citation.]'" (*People v. Clark* (2011) 52 Cal. 4th

9

856, 942–943.)

Furthermore, "'[c]onflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

**C. Aggravated Assault**
Defendant argues there was "no sufficient and independent corroboration of [Avalos's] incriminating testimony." Specifically, he contends, citing *People v. Bowley* (1963) 59 Cal. 2d 855, that the home surveillance video "did not provide corroboration because it had no meaning other than what was read into it" by Avalos because it "showed nothing specific." Baer's testimony also "provided no corroboration" connecting defendant to the commission of the crime, as her "description of the stabber remained both generic and subjectively vague" and should be considered in the context of evidence that very young "pee wees" associated with gangs, Cregan's testimony that none of the persons identified by Avalos were pee wees, and the "lighting, angle of view and subjective perceptions," such as about age. Thus, defendant argues "while Baer's description of the stabber could be interpreted in a way which allowed for the possibility of [defendant's] inclusion in the class of possible participants, it did not immediately and directly connect him to anything." Although defendant concedes that among the four alleged attackers, defendant appeared to be the youngest, he asserts this fact is not significant because it presumes the attackers were as testified to by Avalos. As defendant correctly points out, evidence is not sufficient corroboration if its meaning can only be discerned by relying on the testimony of the accomplice.

Defendant similarly argues that the other corroborating evidence is not significant. As he correctly notes, "'evidence independent of the testimony of the accomplice must tend to connect a defendant with the crime itself, and not simply with its perpetrators. It is not with the thief that the connection must be had but with the commission of the crime itself.'" (*People v. Robinson* (1964) 61 Cal. 2d 373, 400.) Defendant also correctly points out that a finding of fact must be an inference drawn from evidence rather than on mere speculation. (*Reese v. Smith* (1937) 9 Cal. 2d 324, 328, *Gyerman v. United States Lines Co.* (1972) 7 Cal. 3d 488, 503.) He contends that Cregan's testimony about defendant's involvement with PSC, and his testimony about the gang affiliations of Jesus, Miguel, and Avalos, arguably create an inference that they were acquainted with each other, but do not connect defendant to the crime. He also contends that nothing but speculation can be drawn from defendant's arrest a week later at the Mexican border.

Defendant's arguments and contentions, while appropriate at trial, are unpersuasive under our substantial evidence standard of review

10

because he ignores the inferences that can be reasonably inferred from each piece of evidence and their totality, independent of Avalos's testimony. From the testimony of Cregan, Sarabia, Cortez, Baer, Taylor, and Lee, the surveillance home video, and the other evidence, such as the quick discovery by police of the video and Avalos's car, the partial palm print of defendant found on that car, and the circumstances of defendant's arrest, the jury could reasonably infer that defendant was in a gang with Avalos and two other members named Miguel and Jesus that claimed the area of the attack as its territory against its rival gang, that Cortez was a member of that rival gang and was attacked as he walked with his girlfriend, whose clothing displayed that gang's colors, that the attack on Cortez was gang-related, that Avalos's car was used in the attack and that defendant had been in or around the car, that the chief attacker repeatedly stabbed Cortez and was a young-looking, light-skinned Hispanic male whose physical appearance defendant does not challenge was consistent with his own, that three others participated in the attack and that one of them appeared to be Avalos (defendant does not challenge that the video depicted an attacker whose physical appearance was consistent with Avalos's appearance), that police immediately obtained a video of the incident and began an investigation based on what was depicted that quickly led them to Avalos and his car, and that defendant left the area for Mexico very soon after the incident, turning up a week later in the custody of Mexican authorities.

Defendant does not effectively discount this evidence. He essentially argues that each piece of evidence could be interpreted in a way that does not necessarily incriminate him, but this is not the issue under our substantial evidence standard of review. As the People note, whether corroboration is "as compatible with innocence as it is with guilt is a question of weight for the trier of fact." (*People v. Gallardo* (1953) 41 Cal. 2d 57, 63, *disapproved on other grounds in People v. Chapman* (1959) 52 Cal. 2d 95; *People v. Ruscoe* (1976) 54 Cal. App.3d 1005, 1012 [quoting *Gallardo*]; *In re B.D.* (2007) 156 Cal. App.4th 975, 985 [quoting *Ruscoe*].) For example, the video and Baer's testimony each provides some support, however slight, that defendant committed aggravated assault because it was not disputed that the subject person depicted or described had features consistent with defendant's, and the events depicted or described were consistent with those described by Avalos.

Defendant argues in various ways that the evidence, while "consistent with an hypothesis of possible guilt . . . is not sufficient to provide corroboration" because it does not connect defendant directly to the crime. We disagree. It does so in several respects regarding both motive and actual commission of the aggravated assault. The evidence was consistent with, and corroborative of, Avalos's account regarding defendant's active gang participation, the gang-related circumstances of the crime, defendant's connection to Avalos and the car that appeared to have been used in the incident, defendant's engagement in the crime as the chief attacker who stabbed Cortez, the police investigation that almost immediately led to Avalos, and defendant's quick departure from the area. It could reasonably be interpreted by a jury as tending to implicate defendant in the aggravated assault, and substantiates

11

> enough of Avalos's testimony to establish his credibility.
>
> We conclude, therefore, pursuant to *People v. Rodrigues*, *supra*, 8 Cal. 4th at page 1128 and the other case law discussed herein, and based on our substantial evidence standard of review, that the evidence independent of Avalos's testimony satisfies the corroboration requirements of section 1111 regarding his testimony. Defendant's appellate claim lacks merit.

*Serrano*, 2013 WL 441960, at *7-9.

    Serrano has failed to demonstrate that the state court opinion was an unreasonable application of Supreme Court authority. In federal court "a conviction may be based on the uncorroborated testimony of an accomplice." *United States v. Turner*, 528 F.2d 143, 161 (9th Cir. 1975); *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993) ("The uncorroborated testimony of an accomplice is sufficient to sustain a conviction unless it is incredible or insubstantial on its face"). California Penal Code section 1111, which requires corroboration of accomplice testimony, is a "state law requirement" which is "not required by the Constitution or federal law." *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000); *Barco v. Tilton*, 694 F. Supp. 2d 1122, 1136 (C.D. Cal. 2010) (noting that requirement under Cal. Penal Code § 1111 that accomplice testimony be corroborated "is a matter of state law, which does not implicate a federal constitutional right"); *Jones v. Arnold*, 593 Fed. Appx 674, 674-75 (9th Cir. 2015). Serrano's claim that uncorroborated accomplice testimony was improperly used to support his conviction is based solely on a perceived error of state law and is therefore not cognizable on federal habeas review. *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

    The testimony of Avalos was neither incredible nor insubstantial on its face; therefore, Serrano is only entitled to habeas corpus relief if the state court's alleged violation of state law violated his right to fundamental fairness. *Laboa*, 224 F.3d at 979. Serrano has failed to show any such violation. The California Court of Appeal conducted a thorough and detailed analysis and found sufficient evidence that corroborated the accomplice testimony including the videotape evidence, eyewitness testimony, fingerprints, and gang motive. This determination was not unreasonable and does not constitute an arbitrary denial of a state law entitlement. Any rational trier of fact could have relied on the evidence presented to corroborate Avalos's testimony. This

1   claim is denied.

## II. CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id*. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has made no showing warranting a certificate and so none is granted.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**. A Certificate of Appealability is **DENIED**. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

Dated: February 17, 2016

JAMES DONATO
United States District Judge

|   |   |
|---|---|
| UNITED STATES DISTRICT COURT | |
| NORTHERN DISTRICT OF CALIFORNIA | |

| | |
|---|---|
| FRANCISCO J. SERRANO,<br><br>    Plaintiff,<br><br>    v.<br><br>JEFF MACOMBER,<br><br>    Defendant. | Case No. 14-cv-03106-JD<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on February 17, 2016, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Francisco J. Serrano ID: AK7419
CSP-SAC  C-2-226
P.O. Box 290066
Represa, CA 95671

Dated: February 17, 2016

                                        Susan Y. Soong
                                        Clerk, United States District Court

                                        By: _____
                                        LISA R. CLARK, Deputy Clerk to the
                                        Honorable JAMES DONATO